

# In The
# Court of Appeals
# Seventh District of Texas at Amarillo

No. 07-14-00272-CR

MARIO ALBERTO RUIZ, JR., APPELLANT

V.

THE STATE OF TEXAS, APPELLEE

On Appeal from the County Court at Law No 2
Bexar County, Texas
Trial Court No. 443820, Honorable Jason Wolff, Presiding

May 7, 2015

## MEMORANDUM OPINION

Before QUINN, C.J., and CAMPBELL and HANCOCK, JJ.

Mario Alberto Ruiz, Jr. was convicted of possessing marijuana in an amount of two ounces or less. Prior to pleading guilty, the trial court denied his motion to suppress evidence. He challenges that ruling on appeal. We affirm the judgment.[1]

On November 20, 2013, Deputy John Rodriguez was dispatched to perform a welfare check on a twelve year-old female child. She had notified authorities that her mother and step-father were abusing her. Allegedly, when the pre-teen was in trouble,

---

[1] The State did not deign to file a brief.

her mother would strike her with a wooden paddle or leather belt while her step-father would punch her in the stomach. The deputy met the girl at a location other than her home and spoke with her. During this conversation, the child told the deputy that she feared going to her house. The deputy decided to speak with her parents, placed the girl in his patrol car, and drove to her home. The latter was a mobile home in a trailer park.

Upon arriving at the locale, the deputy found another "juvenile" outside the abode. The juvenile was the girl's brother. Their parents were not there, and the doors of the trailer were locked. The boy had neither a key nor a cell phone but knew his parent's phone number. The deputy called that number and spoke with the children's mother. Apparently, she and her husband were meeting with an attorney. When the deputy informed her of the situation, she replied that she and her husband would return in about forty-five minutes.

Once the call ended, the deputy noticed three or four cars at the abode and began to consider if anyone else was at the home to let the children inside. That led him to knock on the front door. It was enclosed within a screened porch. No one answered his knocking. At that point, he left the porch, walked around the trailer, approached a patio area surrounded by a gateless lattice work, and knocked on a window. That knocking also went unanswered. Yet, when knocking on the window, he looked through it and saw four to five marijuana plants growing in the kitchen.

The deputy again called the children's parents and discovered that they were on their way. Twenty or thirty minutes later, two cars drove up. One was driven by the children's parents. The other was driven by the attorney with whom the couple was

meeting earlier.  The deputy described his encounter with appellant, his wife, and the attorney as follows:

> Q.  Okay. Now, when they arrived with their attorney, what happens next?
>
> A.  Well, she gets out of the vehicle. I don't know who she was. I kind of assumed that she was because she was dressed like -- attorney dress, suit and tie. And I was like, Okay, you know, this is why I'm here. I started talking to him first, and then she's, like, Oh, no, you need to talk to me. I'm like, Who are you? And then she explained who she was. I don't remember her name offhand. Explained what I was there for.  And she advised him to keep quiet.
>
> Q.  Okay. In your conversations before she advised them to remain silent and just in the conversation with the attorney, did you inform the defendant about the contraband that you saw?
>
> A.   Oh, yes. Yes.
>
> Q.  Okay.  And at that point in time did the attorney advise them to remain silent?
>
> A.  Yes.
>
> Q.  Okay. Did you inform the defendant or the attorney that you saw the contraband in plain view?
>
> A.  Yes.
>
> Q.  Okay.  Now, at that point in time did you obtain consent to seize the contraband?
>
> A.  At that point in time, no. They were -- they were, you know, hem hawing around, like, Oh, no. The attorney said, No, it's not what you think it is. I'm like, Okay.
>
> Q.  Okay. So what happened next?
>
> A.  Okay. So we're there. I explained why I was there. Told them this is what I was going to do. Based on me seeing it, that I know that I'm going to take into custody. She's like, Well, you need a warrant. I go, No, I don't. It's in plain view. I don't need a warrant. And she's like, Well, let's --
>
> Q.  To be clear, you're having this conversation with the attorney?

3

A.    With the attorney, yes.

Q.    Okay.

A.    Yes. And she's like, Well, you need a warrant. No, I don't. So we're talking about -- I told -- this is what my plans were going to be. I'm going to take him into custody, the mom into custody, take the child, put them with child protective based on the marijuana, based on the accusation of abuse, and she's, Well, let me talk to my clients. And I said, Okay, go ahead and confer with them.

So she conferred for a few minutes, comes back, and she said, Well, what do you want to do? I said, Well, I just want him to confess because I know it's his. The daughter told me that it's his. He's growing it. If he tells me -- mans up, I'll take him, let everybody go, contact child protective. I have to. Whatever happens with the child and the mom, that's up to child protective. I go, But, you know, I already have the -- the weed there, him, that's all I want.

Q.    So you've informed them that you've already seen the marijuana --

A.    Yes.

Q.    -- at this point in time?

A.    Yes.

Q.    And they're trying to come to some sort of arrangement with you about it --

A.    Yes.

Q.    -- but you're telling them, Look, I have to report this --

A.    Yes.

Q.    -- at this point in time?

A.    Yes.

Q.    So after you've informed them and had this conversation, what happened next?

A.    Right after that they gave me consent. He went in there with his wife -- well, the attorney said, Okay, being that you know where the marijuana's at, is that the only place you need to get? You're not going to search the house? I go,

4

No, just -- that's all I want. [2]

Appellant moved to suppress the marijuana seized by the deputy. The trial court denied the motion. Whether it erred in doing so is the question before us. Appellant contends that the deputy had no right to enter the curtilage of the residence to look in the window and that any consent to enter the house was involuntary. We overrule his issue.

The applicable standard of review is discussed in both *Meekins v. State*, 340 S.W.3d 454, 460-61 (Tex. Crim. App. 2011) and *Valtierra v. State*, 310 S.W.3d 442, 447-48 (Tex. Crim. App. 2010). The parties are directed to those opinions for its discussion.

Next, a warrantless search of a home is presumptively unreasonable. *Gutierrez v. State*, 221 S.W.3d 680, 685 (Tex. Crim. App. 2007). This presumption encompasses a search of the home's curtilage, and curtilage consists of that "area around the home to which the activity of home life extends." *Oliver v. United States*, 466 U.S. 170, 182 n.12, 104 S.Ct. 1735, 80 L.Ed.2d 214 (1984). Furthermore, the curtilage may include such areas as a porch adjacent to the house. *See Florida v. Jardines*, __U.S. __, 133 S.Ct. 1409, 1414, 185 L.Ed.2d 495 (2013). Yet, an unreasonable search generally does not arise from a police officer traversing a sidewalk or pathway to a front door and

---

[2] The attorney would eventually testify that she did not represent appellant, but only his wife. So too did she deny telling appellant to remain silent. During her testimony, she also described the deputy's words at the scene as more threatening in nature. That is, she said he was going to arrest both appellant and his wife, place the children in the State's custody, and "tear up the place" if he was to get a warrant. That the attorney's testimony created issues of fact and credibility is apparent. She attempted to portray the deputy as threatening, while the deputy described the interchange as more of a negotiation with legal counsel. Who to believe is not our concern. Rather, the burden fell upon the trial court, as fact finder, to resolve issues of fact and witness credibility, and we must defer to its determination. *Meekins v. State*, 340 S.W.3d 454, 461 n.32 (Tex. Crim. App. 2011). So, the trial court could well have accepted the deputy's version of the events as accurate, while discounting the version propounded by the attorney. And, in accepting the deputy's version, the trial court could well have concluded that the attorney was representing both appellant and his wife at the scene, despite her testimony to the contrary.

knocking on it, as long as the resident has not manifested an intent to restrict access to the area. *Cooksey v. State*, 350 S.W.3d 177, 184 (Tex. App.—San Antonio 2011, no pet.); *Washington v. State*, 152 S.W.3d 209, 214 (Tex. App.—Amarillo 2004, no pet.). And, while there may be occasion when an officer may approach a back door when no one answers the front, *see e.g. Duhig v. State*, 171 S.W.3d 631, 637-38 (Tex. App.—Houston [14th Dist.] 2005, pet. ref'd), that authority does not encompass situations where he ignores normal paths of traffic to look into windows on the side of a house. *Sayers v. State*, 433 S.W.3d 667, 675 (Tex. App.—Houston [1st Dist.] 2014, no pet.).

Here, we do not address whether the deputy illegally searched the trailer before appellant, his wife and the attorney arrived at the scene. Instead we focus on the matter of consent, that is, whether appellant consented to the deputy's entry into the abode to seize the marijuana plants. Sufficiently attenuated consent to search may render irrelevant a prior violation of the Fourth Amendment to the United States Constitution. *Brick v. State*, 738 S.W.2d 676, 678 (Tex. Crim. App. 1987).

Again, a search conducted without a warrant is unreasonable *per se*. *Meekins v. State*, 340 S.W.3d at 458-59; *Cruz v. State*, No. 04-13-00629-CR, 2014 Tex. App. LEXIS 12462, at *4 (Tex. App.—San Antonio November 19, 2014, no pet.) (mem. op., not designated for publication). However, the rule is subject to a few exceptions, one of which is voluntary consent. *Meekins v. State*, 340 S.W.3d at 458-59. That is, securing a warrant is unnecessary when an officer is given valid, voluntary consent to conduct a search. Furthermore, consent is so given when it is not the product of impermissible coercion, threat, or force. *See id.* (stating that the Fourth and Fourteenth Amendments

to the United States Constitution require that consent not be coerced, by explicit or implicit means, by implied threat, or covert force).

The validity and voluntariness of one's consent to search are questions of fact determined from the totality of the circumstances. *Id.* at 459. That standard requires us to "review the totality of the circumstances of a particular police-citizen interaction from the point of view of the objectively reasonable person, without regard for the subjective thoughts or intents of either the officer or the citizen." *Id.* Furthermore, the "ultimate question is whether the person's "'will ha[s] been overborne and his capacity for self-determination critically impaired,'" such that his consent to search must have been involuntary." *Id. quoting Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973).

Here, the trial court had before it evidence of 1) appellant and his wife arriving at the scene with an attorney, 2) the attorney advising them to remain silent, 3) an attorney directing the deputy to converse with her as opposed to appellant and his wife, 4) the attorney discussing matters with appellant and his wife while conversing with the deputy, 5) the attorney appearing to inquire into some type of "arrangement" with the deputy, 6) the attorney inquiring into the extent of the deputy's search of the abode if he was allowed inside, 7) the attorney saying "okay," and 8) appellant agreeing to give the deputy trash bags to assist in the seizure and transportation of the marijuana plants.

It may well be that the deputy informed all present that he would be contacting the child protective authorities; yet, the representation was not conditioned on appellant cooperating or withholding cooperation. And while another deputy was present, the

7

evidence failed to illustrate that the two law enforcement personnel brandished their weapons or otherwise undertook a physically threatening demeanor.

Simply put, the presence of an attorney and the interaction between that attorney, the deputy, and appellant provided ample evidence upon which a trial court could conclude that the decision to allow entry into the home was informed and voluntary. At the very least, deciding that appellant's will was not overborne and his capacity for self-determination was not critically impaired when agreeing to allow the deputy to enter the house and seize the marijuana fell within the zone of reasonable disagreement. Consequently, the trial court's decision to deny appellant's motion to suppress was not an instance of abused discretion.

Accordingly, the judgment is affirmed.


Brian Quinn
Chief Justice

Do not publish.